Daniel C. MULLIGAN, Jr., Plaintiff-Appellant,

v.

OTIS ELEVATOR COMPANY, a New Jersey corporation, Defendant-Appellee.

No. 14138.

United States Court of Appeals Seventh Circuit.

Sept. 27, 1963.

Floyd F. Cook, Daniel J. Harrigan, Cook, Bayliff, Mahoney & Martin, Kokomo, Ind., for plaintiff-appellant.

Gustav H. Dongus, Indianapolis, Ind., for defendant-appellee, Fauvre, Dongus, Ging & Gemmer, Indianapolis, Ind., of counsel.

Before SCHNACKENBERG, KNOCH and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Daniel C. Mulligan, Jr., plaintiff, has appealed from a judgment of the district court which was entered upon a directed verdict on the motion of Otis Elevator Company, a New Jersey corporation, defendant. These proceedings took place at the close of plaintiff's case.

By his action, plaintiff sought to recover damages for personal injuries which the evidence shows he sustained while working as an employee of Marhoefer Packing Company. On August 21, 1959, in the performance of his duties, he came to the third floor entrance to a freight elevator which had been originally installed on January 28, 1928, by defendant, pursuant to a contract between it and Kuhner Packing Company, which was the predecessor in interest of Marhoefer.

As originally installed the elevator was designed so that it could be operated only by a person on the elevator. On May 26, 1931, defendant also installed on the wall of each landing double button controls, thereby permitting operation of the elevator from the outside as well as from the inside of the car. Thus it could be moved from another floor by pressing and holding the "up" or "down" wall button. However, defendant retained in the hoistway entrance to the elevator certain wooden gates which were installed on March 23, 1928, such gates being 5½ feet high, thus leaving an opening of 18 inches between the top of the gate on the third floor and the top of the hoistway opening into the elevator. There was no gate on the elevator itself. At that time this was an acceptable design according to the American Stand-

ard Safety Code, which sets minimum safety standards for the elevator industry. To move the elevator car all three hoistway landing gates had to be closed and constant pressure maintained on the button, otherwise the car would stop.

These gates, which operated by hand, could not be opened while the car was in motion or unless the car was stopped within one inch of the threshold landing. The elevator car was not self-leveling, and to level the car at any floor it was necessary to push or "jog" the up-and-down buttons until the car floor was level with the hoistway floor.

Prior to the date of the accident Kuhner or Marhoefer replaced the wooden hoistway gate with a metal gate made of diamond wire mesh supported by a pipe frame. This gate was made and installed by Kuhner or Marhoefer as a result of a regulation by the United States Department of Agriculture requiring wooden equipment to be replaced by metal for sanitary reasons and followed the design of the wooden gate with the same height of 5½ feet.

An expert witness for plaintiff, John A. Miller, testified that in his opinion the elevator was dangerous with the double-button controls and an opening above the gate, for the reason that somebody at a remote button station could operate the elevator while someone at another floor was attempting to operate or level the elevator, although all the gates would be closed. He also expressed the opinion that certain precautions could have been taken, such as extending the gate to the *full height of the opening,* painting a leveling mark on the elevator car, installing an automatic leveling system, or installing a warning bell with a timer device. However, on cross-examination, Miller testified that some fifty-seven recognized elevator companies currently in business, including defendant, had made thousands of the same type elevators with 5½ foot gates during the period including 1931. He further testified that such a gate met the requirements of the rule contained in the 1925 edition of the

American Standard Safety Code for Elevators in effect in 1931, although in a footnote to the rule it was recommended that gates be installed the full height of the opening or a minimum of ninety inches. The footnote recommendation was removed in the 1937 Safety Code.

Defendant never had a contract with Marhoefer or Kuhner for the servicing or maintenance of the elevator. It did make a number of repairs on the elevator after 1931 pursuant to specific orders from Kuhner and later Marhoefer, but plaintiff makes no claim that any such repairs caused the accident. Marhoefer had a maintenance staff of forty-two men including six electricians, who worked on its machinery and elevators and had done a great deal of repair work over the years on the elevator involved.

Plaintiff's amended complaint charged that the elevator "was carelessly and negligently designed, installed, serviced, inspected and maintained" by defendant, "so that it was imminently and inherently dangerous to perform an elevator service for which it was intended"; that defendant "knew of the imminently and inherently dangerous condition of said elevator, but concealed and failed to inform the plaintiff or the plaintiff's employer of the dangerous design and installation".

Defendant pleaded as affirmative defenses contributory negligence and that plaintiff incurred the risk of injury.

Because of the usually wet conditions incident to the meat packing industry, which caused some absorption of the lighting around the elevator, it was difficult to line up the elevator and the hoistway floor. Plaintiff, 22 years old, who was six feet four and one-half inches tall, was higher than the gate and on the occasion of the accident he put his chin above or on top of the gate as he glanced over it. At that moment someone from another floor pushed a "down" button, causing the ceiling of the elevator, which was actually in front of him, to descend and strike the top of plaintiff's head and he was injured.

Fortunately a fellow worker pressed an emergency stop button.

Plaintiff testified that he had noticed that other people, in leveling the elevator to particular floors, "lean way back, push the button and lean way back and go up and look at it real close." These were smaller men, he said, and that he was more fortunate, being taller and he "could look over the gate and see if it was level, move it a little bit, look over it".

1. There is no contention that plaintiff, an adult, did not have possession of normal faculties. He had observed the elevator and its manner of operation, as well as the presence of the gate, the obvious purpose of which was to keep persons out of the elevator shaft. He had used the elevator daily and must have been familiar with its operation. The gate afforded reasonable protection to persons who used it and the gate in a reasonable manner. Neither defendant nor anyone else was required to design, install or maintain an absolutely accident-proof or fool-proof elevator.

The danger of exposing his head over the top of the gate into the fixed path of the elevator was obvious and there was no duty on defendant, in designing and installing the elevator, to guard plaintiff against injury resulting from his placing his head in the path of the moving elevator.

For these reasons it was the duty of the district court to direct a verdict for defendant.

2. It is unnecessary for us to consider other undisputed facts appearing in evidence which likewise support the action of the district court, based on the principle that defendant was under no duty to warn plaintiff of an obvious danger, and that the injury to plaintiff was the result of the independent action of Kuhner or Marhoefer in replacing the wooden gate with the metal gate. These facts also support the action of the district court.

Plaintiff can find no support in Elliott v. General Motors Corporation, 7 Cir., 296 F.2d 125, for the reason that we were there considering a defective and dangerous condition existing in an automobile produced by defendant manufacturer which condition was concealed from clear view. Everything in the situation confronting plaintiff in the case at bar would have been obvious to anyone who was using normal faculties. The plaintiff in Elliott was a mechanic who in the ordinary course of his work could not see the defective condition which caused his injury. Plaintiff in the case at bar in exercising care for his own safety was not required to put his head into the elevator shaft. His mistake in looking into the shaft in a grossly negligent manner was the cause of his injury. Nothing essential to his safety was concealed from him.

For these reasons the judgment of the district court is affirmed.

Judgment affirmed.